# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

————————

No. 00-2346MN

————————

| | | |
|---|---|---|
| Independent School District No. 284, | * | |
| Wayzata Area Schools, | * | |
| Wayzata, Minnesota, | * | |
| | * | On Appeal from the United |
| Appellee, | * | States District Court |
| | * | for the District of |
| v. | * | Minnesota. |
| | * | |
| A.C., by and through her parent, C.C., | * | |
| | * | |
| Appellant. | * | |

————————

Submitted:  February 14, 2001

Filed:  August 3, 2001

————————

Before RICHARD S. ARNOLD, LAY, and HANSEN, Circuit Judges.

————————

RICHARD S. ARNOLD, Circuit Judge.

This case arises under the Individuals With Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1487 (1994) (amended 1997).  A state hearing officer ordered the appellant, Independent School District No. 284 ("the District"), to pay the costs of a residential education and treatment program for A.C., a student with a variety of emotional and behavioral problems.  The District brought this action in federal district court pursuant to 20 U.S.C. § 1415(i)(2), and obtained a ruling that the residential placement was not educationally necessary.  A.C. appeals, and we reverse.

I.

When A.C. moved into the District, she was 15 years old. Her previous school district had provided her with special-education services for emotional and behavioral disorders and had developed an Individualized Education Program (IEP) which assigned her to a special, "self-contained" classroom. A.C.'s school-related problems included classroom disruption, profanity, insubordination, and truancy. School officials in her old district had tried to deal with these problems by allowing her to take her classes at an off-campus day center for troubled kids. That didn't work: she would either leave the center or not show up at all. Outside of school, she used alcohol and illegal drugs, was sexually promiscuous, repeatedly ran away from home, was thought to have forged checks, and was hospitalized three times for threatening or attempting suicide. Her mother, C.C., tried to get the county social services department to pay for a residential treatment program. The county offered placement in a juvenile correctional facility, which C.C. declined. After that, C.C. stopped telling the county about A.C.'s absences from home. C.C. also tried, unsuccessfully, to obtain a court order placing A.C. in a non-correctional residential treatment center.

When District No. 284 first took on the responsibility of educating A.C., it tried to implement the IEP from her old district. It placed her in one of two self-contained classrooms for students with emotional and behavioral problems. On her third day of attendance, A.C. was suspended for behaving inappropriately, cursing, and disobeying a school authority. The school returned A.C. to the self-contained classroom while it reviewed her placement. After a few days, she stopped coming to class. Meanwhile, C.C. resumed trying to obtain a court-ordered residential placement. A.C.'s current high school's social worker, her previous school's staff psychologist, and her IEP manager wrote letters to the court. All three agreed that A.C.'s behavior was interfering with her academic progress. The psychologist and the IEP manager also noted that past educational strategies had been ineffective, and said that A.C. needed a highly structured program that would address her behavioral and psychological problems. The

court refused to order a residential placement. Instead, it ordered A.C. to attend school, an order with which she did not comply.

C.C. continued to pursue a residential placement. She had several meetings with A.C.'s IEP team and provided the District with the information presented to the juvenile court. As an interim measure, the District provided homebound instruction services, of which A.C. made sporadic use. For the longer term, the District said that it would either return A.C. to the self-contained classroom or enroll her in a day treatment program on the campus of the University of Minnesota, to which she could travel by city bus. C.C. was not satisfied with these choices. She asked that A.C. be enrolled at Rocky Mountain Academy (RMA), a residential treatment center in Idaho, at District expense. The District agreed to pay the "educational" costs of this placement, but not costs related to therapy or lodging. In monetary terms, that meant the District would pay a little more than one third of the $55,000 annual attendance charge for RMA.

With negotiations at an impasse, the District agreed to an Independent Educational Evaluation (IEE) of A.C. by a neuropsychologist on the faculty of the University of Minnesota. The evaluator found no major attention problems, hyperactivity, learning disabilities, deficiencies of intelligence or memory, or the like. Instead, she traced A.C.'s educational problems to "psychological difficulties" such as her "oppositionality, manipulative tendencies, and strong need for control and attention." On the basis of these observations, A.C. was diagnosed with "conduct disorder," but the evaluator explained in her deposition that this diagnostic category was used mainly because the patient was still too young to be diagnosed with a personality disorder. She said that a diagnosis of antisocial or narcissistic personality disorder would probably be appropriate when A.C. reaches the age at which those categories are applied. The evaluator strongly recommended that A.C. be placed in a secure facility, largely to prevent truancy, and predicted that, after a course of treatment, A.C. would probably be able to return to the classroom. According to findings in the administrative record, the evaluator

considered a day treatment placement, and does not believe it will be effective as the Student will not attend. While a day treatment facility could provide educational services, the services would be ineffective . . . due to the nature and extent of her emotional and behavioral disorder.

Findings of Fact, Conclusions, and Decision of Independent Hearing Officer (hereafter IHO Decision) at 11. The state review officer found that the "IEE Evaluator concluded unequivocally that it is necessary for Student to be in a secure residential treatment facility in order for Student to gain educational benefit." Findings of Fact, Conclusions of Law, and Decision of Hearing Review Officer (hereafter HRO Decision) at 9. The private psychologist who has been treating A.C. since 1996 believes that she exhibits borderline personality development and may have dysthymia, a form of depression.

The controversy next went to an administrative hearing in the Minnesota Department of Children, Families, and Learning. The Independent Hearing Officer ordered the District to provide 100 hours of compensatory education and to convene an IEP meeting for the purpose of "locat[ing] an appropriate residential placement to meet the Students [sic] emotional, behavioral and educational needs." IHO Decision at 21. The Hearing Review Officer affirmed. The District then commenced this action, as permitted by 20 U.S.C. § 1415(i)(2)(A). The District Court affirmed the award of compensatory education, a decision from which the District does not appeal. As to the residential placement, the District Court reversed. It noted that the IEE evaluator had testified that the day program proposed in the District's IEP " 'would educationally meet her needs, . . . from the standpoint of the individualized kind of work that she needs to meet her educational needs.' " Order at 5, quoting Hearing Transcript at 621. Because the Court found nothing in the record to suggest that A.C.'s behavioral problems rendered her *unable* to attend the day program, it concluded that a residential placement was not necessary to address her educational needs.

## II.

The IDEA "was intended to ensure that children with disabilities receive an education that is both appropriate and free." Florence County School District 4 v. Carter, 510 U.S. 7, 13 (1993). As defined in the Act, 20 U.S.C. § 1401(8), a "free appropriate public education" includes both instruction, which must be specially designed to suit the needs of the disabled child, see 20 U.S.C. § 1401(25), and "related services," including "such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(22). It is undisputed that A.C. is a "child with a disability" within the meaning of 20 U.S.C. § 1401(3)(A).

The purpose of this action is to determine whether a residential placement is part of the special education and related services the District must provide in order to give A.C. a free appropriate public education. The Supreme Court held in Board of Ed. of the Hendrick Hudson Central School Dist., Westchester County v. Rowley, 458 U.S. 176, 206-07 (1982), that

> a court's inquiry in suits brought under [§ 1415(i)(2)] is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

Id. at 206-07 (footnotes omitted). The parties do not dispute that the procedural requirements of the IDEA were met here. The question before us, therefore, is whether the District's IEP is reasonably calculated to provide A.C. with educational benefits.

This is a mixed question of law and fact, which we review de novo. Strawn v. Missouri State Board of Educ., 210 F.3d 954, 958 (8th Cir. 2000).

That our review of the District Court is de novo does not mean that we write on an entirely clean slate. We must afford "due weight" to the outcome of the state administrative proceedings, giving particular consideration to state officials' educational judgments. Rowley, 458 U.S. at 206; see also Strawn, 210 F.3d at 958; E.S. v. Independent School District No. 196, 135 F.3d 566, 569 (8th Cir. 1998) (a reviewing court should "resist[] any impulse to 'substitute [its] own notions of sound educational policy for those of the school authorities' ") (quoting Rowley, 458 U.S. at 206). In some cases, however, a court may have good legal reasons for rejecting a state's decision. For example, the IDEA expresses the will of Congress that disabled students be educated with non-disabled students "[t]o the maximum extent appropriate." 20 U.S.C. § 1412(5)(A). We have reversed a state decision concerning an IEP where no educational reasons were given for placing a disabled child in a separate learning environment. See Independent School District No. 283 v. S.D., 88 F.3d 556, 561-62 (8th Cir. 1996) (district court correctly reversed hearing review officer's separate placement, where both the school district and the first-tier state hearing officer judged a mainstream placement appropriate, and the review officer gave no educational reason for disagreeing with them).

Despite the statutory preference for mainstream placements, the IDEA recognizes that some disabled students need full-time care in order to receive educational benefit. It defines "special education" to include "instruction conducted . . . in hospitals and institutions," 20 U.S.C. § 1401(25); cf. 34 C.F.R. 300.26 (2000). Regulations promulgated under the statute by the United States Department of Education require that, "[i]f placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child." 34 C.F.R. § 300.302 (2000). The reason for this rule is

straightforward: if a residential placement is educationally necessary because of a student's disability, and the state does not provide it, then the state's IEP is not "reasonably calculated to enable the child to receive educational benefits" as required by Rowley. Thus, the IDEA requires that a state pay for a disabled student's residential placement if the student, because of his or her disability, cannot reasonably be anticipated to benefit from instruction without such a placement. See Mrs. B. v. Milford Board of Ed., 103 F.3d 1114, 1122 (2d Cir. 1997) (asking "whether the child requires the residential program to receive educational benefit"); McKenzie v. Smith, 771 F.2d 1527, 1534 (D.C. Cir. 1985) (asking " 'whether full-time placement may be considered necessary for educational purposes, or whether the residential placement is a response to medical, social or emotional problems that are segregable from the learning process.' ") (quoting Kruelle v. New Castle County School Dist., 642 F.2d 687, 693 (3d Cir. 1981)).

## III.

The District first argues that the case is moot, because A.C. has apparently moved to another district and has conceded that the District is not responsible for prospective relief. In Thompson v. Bd. of the Special School Dist. No. 1, 144 F.3d 574, 579 (8th Cir. 1998), we held that a student's IDEA claim was moot because his old district was not responsible for providing him a due-process hearing, which he requested only after he had left the district to attend another school. Here, however, A.C.'s due-process hearing is over. A.C.'s claim in this case concerns obligations the District allegedly had in the past and failed to meet. The remedy sought is compensatory. It does not matter whether the District has any present or future obligation to develop a new IEP for her or to give her further hearings. If A.C. or her mother had paid the costs of a private placement at the time, and then sued the District for reimbursement, the claim would not be moot. See Zobrest v. Catalina Foothills School Dist., 509 U.S. 1, 4 n.3 (1993). We think that the same result should obtain here. In either case, the claim is that the statute obligated the school district to pay for

the placement during the time when it was responsible for the student's education. Assuming that A.C.'s claim has merit, it would not make sense to deny her a remedy against the District just because her parent did not or could not pay for the placement that the District denied her.

We therefore turn to the merits. The District Court held that

> the record . . . makes it clear that residential placement is necessary only to treat Plaintiff's social and emotional problems, not for educational purposes. . . . Student's problems, and the risks to which she is exposed, are social and emotional in nature. In fact, the IEE Evaluator specifically noted that Student has no neurological deficits which interfere with her learning and is of average intelligence, with no symptoms of ADD or ADHD, and found that day treatment would meet Plaintiff's educational needs. [Citation omitted.] While one manifestation of A.C.'s emotional behavioral disorder is her *unwillingness* to attend school or comply with the requirements of ISD 284's IEP, there is nothing in the record to support a conclusion that there is anything about A.C.'s disorder which renders her *unable* to attend school or *unable* to comply with the IEP.

Order of Magistrate Judge at 10. There is much in this assessment with which we agree. Certainly no one disputes that A.C. has social and emotional problems, and the record would not support a finding that she has learning disabilities. We also think it unlikely that Congress meant for the IDEA to require states to provide a home away from home for students who simply make bad choices, even if those choices cause them to fail in school. See, e.g., Springer v. Fairfax County School Bd., 134 F.3d 659, 664 (4th Cir. 1998) (holding that student diagnosed with "conduct disorder" did not have an emotional disturbance but was merely "socially maladjusted" under the precursor to 34 C.F.R. § 300.7(c)(4)(ii) (2000)).

We do not believe, however, that the analysis can be limited to a stark distinction between unwillingness and inability to behave appropriately. There is a grey area

between normal, voluntary conduct and involuntary physiological response, and that area is where Congress has chosen to locate behavioral problems such as A.C.'s. The IDEA clearly includes "emotional disturbance[s]" as disabilities. 20 U.S.C. § 1401(3)(A). According to the Department of Education, an emotional disturbance is

> [A] condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:
>
> (A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.
>
> (B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.
>
> (C) Inappropriate types of behavior or feelings under normal circumstances.
>
> (D) A general pervasive mood of unhappiness or depression.
>
> (E) A tendency to develop physical symptoms or fears associated with personal or school problems.

34 C.F.R. § 300.7(c)(4)(i). Read naturally and as a whole, the law and the regulations identify a class of children who are disabled only in the sense that their abnormal emotional conditions prevent them from choosing normal responses to normal situations. See Honig, California Superintendent of Public Instruction v. Doe, 484 U.S. 305, 320 (1988) (stating, of an emotionally disturbed student, that "[i]t is [the student's] very inability to conform his conduct to socially acceptable norms that renders him 'handicapped' within the meaning of the EHA").

Consistently with this reading, a child whose disabling condition manifests itself in disruptive conduct is exempted, to a degree, from normal disciplinary procedures.

While Education Department regulations do permit children with disabilities to be suspended from school under some circumstances, see 34 C.F.R. § 300.520(a)(1), the Department also instructs schools that suspension or expulsion is not normally appropriate as a first-line response to behavior problems resulting from a student's disability, even if the conduct in question violates school rules. See 34 C.F.R. Part 300, App. A, Individualized Education Programs (IEPs) and Other Selected Implementation Issues, VI.38 (2000). Instead, the student's IEP team should address the behavior in the first instance, using suspension and other disciplinary measures only if appropriate in the context of the IEP. Id. This does not mean that the IDEA has obliterated the concept of personal responsibility, or that children with disabilities cannot be punished for simple misbehavior. It merely reflects the Department's judgment that sometimes, with certain children, what looks like simple misbehavior is actually a more complicated problem whose remedy should be integrated into the child's overall program of special education.

The preponderance of the evidence in the record before us supports the state's conclusion that A.C.'s truancy and classroom disruption belong in this category. Although the IEE evaluator reported that A.C. "does not have any significant neurocognitive impairment," Summary of Evaluation at 6, cf. Hearing Transcript at 623, she also found A.C. to be "very impaired" with respect to her disabling condition, and even repeated the phrase for emphasis. Hearing Transcript at 653. Asked to clarify, she said that the latter finding related to "[A.C.'s] conduct disorder and her total functional impairment. . . . [H]er ability to operate on a day-to-day basis is impaired. She is not impaired cognitively." Id. at 662. Both the IEE evaluator and A.C.'s treating psychologist regard her lack of self-control as a settled disorder traceable to early experiences. See Summary of Evaluation at 3-4 (noting that A.C.'s treating psychologist "feels that [A.C.] has suffered significant trauma," stating that "[i]t is clear from the interviews with [A.C.] and her mother that [A.C.] has experienced a significant emotional turmoil and that this has had a profound effect on her personality development," and tracing A.C.'s excessive need for control to her " 'parental'

experiences as a young child"). Perhaps these facts do not show that A.C. is irresistibly compelled to cut school, but they do tend to show that her truancy and defiance of authority result from a genuine emotional disturbance rather than from a purely moral failing. The school district, which has the burden of proof here, see E.S., 135 F.3d at 569, has presented no evidence to the contrary.

The District Court accurately described A.C.'s problems as "social and emotional in nature," and concluded from this that they were "separable from the learning process." Order of Magistrate Judge at 9-10. That conclusion does not follow. Apart from other reasons, the mere fact that Congress regards emotional disturbances as disabilities entitling a child to special education shows that, at least in Congress's judgment, social and emotional problems are not *ipso facto* separable from the learning process. Nor do we agree with the Seventh Circuit that a problem resulting from a disability is separable from the learning process if the problem is "not primarily educational." Dale M. v. Bd. of Ed. of Bradley-Bourbonnais High School Dist. No. 307, 237 F.3d 813, 817 (7th Cir. 2001). If the problem prevents a disabled child from receiving educational benefit, then it should not matter that the problem is not cognitive in nature or that it causes the child even more trouble outside the classroom than within it. What should control our decision is not whether the problem itself is "educational" or "non-educational," but whether it needs to be addressed in order for the child to learn.

Moreover, the record here does not permit the conclusion that A.C.'s behavior problems are separable from the learning process. The IEE evaluator made quite clear her judgment that A.C. will not receive educational benefit unless her emotional and behavioral problems are dealt with. The school psychologist from her old district, drawing on over two years of that district's experiences with her, said that "[f]or any placement to be successful, there will need to be the ability to exert sufficient control while providing a therapeutic approach." Letter of 9/22/98 at 2, Joint Appendix (JA) at 355. An assessment by District 284 itself, completed after A.C.'s brief period of

attendance there, says that A.C.'s behavioral and emotional problems must be addressed if she is to succeed academically. Even the IEP at issue here states that A.C.'s "[g]rades and credit completion suffer as a result of her explosive and oppositional behavior," and that "[s]he needs a high degree of structure and support, including immediate feedback with her behavior in order to be successful." IEP of 3/19/99 at 2, JA at 357. This is not a case where the correction of behavioral and emotional problems is merely desirable in order to improve a student's performance: at the time of her hearing, which occurred at the end of her tenth-grade year, A.C. had completed only nine of the 32 credits required for graduation, although she is of average intelligence and has no learning disability. Both hearing officers found that A.C.'s truancy and disruptiveness had substantially prevented her from receiving educational benefit. We see nothing in the record that would support a finding to the contrary.

IV.

The remaining question, then, is whether A.C. can reasonably be expected to make academic progress outside of a residential program. If we regard this as an educational question, there appears to be a consensus in the negative. A.C.'s treating psychologist, her IEE evaluator, her old district's school psychologist, her mother, and both state hearing officers all have reached the conclusion that a residential placement is necessary in order for A.C. to get an education. It is true that the evaluator testified that a day program like the one recommended by the District "would educationally meet [A.C.'s] needs," Hearing Transcript at 621, but it is clear from the context that this remark referred only to the appropriateness of the kind of instruction provided and not to the "related services." Of all the educators whose views of the matter appear in the record, the only one that does not recommend a residential placement is the school district that is being asked to pay for it. This tends to show that the District's recommended placement is not reasonably calculated to enable A.C. to receive

educational benefit, or, put otherwise, that a residential placement is necessary to provide A.C. with special education and related services.

The District characterizes A.C.'s need for a residential placement as a need for confinement, and argues that confinement is not a "related service" it is required to provide. This view has some justification. The IEE evaluator testified that

> the real issue is, you know, how can you get her into an educational setting. When she is with her tutor and if she shows up for her tutoring, she does her work and she is able to do her work. There is no problem in doing her work. It is a question, really, of getting her and a teacher in the same room and she getting to that place and sitting down with that teacher.

Hearing Transcript at 622-23. In response to questioning by the District's attorney, she further stated that her recommendation of a residential placement was based on her judgment that A.C.

> will leave any treatment facility. She will run from any treatment facility that is not [sic] where she's not confined in some way, because, ultimately, any treatment facility is going to ask her to do things that she does not want to do. And that is why she cannot be educated in a normal way, because she is not – she just will not attend.

Id. at 614. The evaluator also emphasized the benefit to A.C. of being prevented from using drugs and from engaging in promiscuous sex. Id. at 618-19, 623.

These statements should not be viewed in isolation, however. Taken as a whole, the IEE evaluator's testimony suggests that a residential placement is necessary in order to correct A.C.'s behavioral and emotional problems, not just to keep her off the streets or to force her to sit down with a tutor. Although tests reveal A.C. to be a shrewd problem solver, she fails to exercise good judgment in her dealings with others because

she lacks empathy, defined as "the ability . . . to gauge behavior according to what other people want from you." Hearing Transcript at 590. This deficiency was confirmed, for example, by her Rorschach inkblot test, in which she identified none of the shapes as human. Id. at 592. When asked to give a prognosis for A.C., the evaluator said, "I think she can improve . . . otherwise, you would just put her in a confined situation without any treatment. Obviously, I think there can be improvement." She testified that neither medication, individual psychotherapy, nor family therapy was likely to do much good, but that the residential aspect of a secure facility would probably have therapeutic benefit:

> the fact is that at a residential treatment program, . . . the environment is the therapy. And, you know, I think that it's a sort of a relearning process that she needs. I mean, she needs socialization. . . . [S]he's very narcissistic and does not have this sort of sense of what the other feels or what the other is responding to.
>
> And so, you know, I think in a setting where that kind of emphasis is placed in terms of the interactions with others – you know, sometimes peer pressure can be very effective with individuals like her. If everybody in her unit is pressuring her to behave in a certain way or her counselor is pressuring her to behave and she has to alter her behavior under those conditions. So that's what an environment, you know, is going to do for her. Psychotherapy is not going to do that.

Id. at 617-18. It would be one-sided, therefore, to say that mere confinement was the evaluator's reason for recommending a residential placement. An independent and sufficient reason for that recommendation was to provide treatment for a psychological problem that has prevented A.C. from making acceptable academic progress.

The District also argues that the IDEA's preference for mainstream placements counsels against placing A.C. in a residential facility. Although our cases have placed

emphasis on this statutory preference, see, e.g., Springdale School Dist. No. 50 of Washington County v. Grace, 693 F.2d 41, 43 (8th Cir. 1982) (classing the preference among the "primary directives" of the IDEA); S.D., 88 F.3d at 561 (calling it a "strong preference"), we do not believe it is implicated here. The statute requires mainstreaming only "to the maximum extent appropriate," not to the maximum extent possible. 20 U.S.C. § 1412(5)(A). As the Supreme Court explained in School Committee of the Town of Burlington, Mass. v. Dept. of Ed. of Mass., 471 U.S. 359, 373 (1985), in crafting this language "Congress was concerned about the apparently widespread practice of relegating handicapped children to private institutions or warehousing them in special classes." Here, the District itself agrees that A.C. should be in an off-campus institution where she can receive individualized instruction in a setting designed for students with disabilities like hers. No one is proposing a mainstream placement, or anything close to it. Moreover, the record amply demonstrates that the decision to put A.C. into a residential facility is not mere "warehousing" but a considered judgment based on an assessment of her individual needs. The only question here is whether she should go home at night or remain in a special institution twenty-four hours a day. Because the preponderance of the evidence shows that she will not receive educational benefit in the less restrictive setting, the statute's preference is overcome here.

Finally, the District argues that neither it nor this Court has the power to order A.C. placed in a secure facility. That is beside the point. The question before us here is not whether A.C. must attend such a facility, but who should pay for it if she does.

V.

For the reasons stated, the judgment of the District Court is reversed, and the cause remanded for the development of an appropriate remedy. Fashioning an appropriate remedy will require findings of fact: for example, it must be determined whether and when A.C. ceased to reside in the District, and whether RMA was an

-15-

appropriate residential placement for her. We therefore remand the case for further proceedings consistent with this opinion.


HANSEN, Circuit Judge, concurring.

I agree with the court's analysis in this case which concludes that the expert testimony of record indicates that this is the very rare case where a school district is obligated to pay for a residential treatment setting as a related service in order to ensure that the child receives the educational benefit that Congress has declared she is entitled to receive. I write specially to emphasize that the district court's task on remand of fashioning an appropriate remedy will be a difficult one. In my view, the student is entitled to compensatory education but not to compensation in the form of dollar damages.

The district court has broad discretionary authority to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B)(iii) (1998 Supp. IV). The Supreme Court has stated that the remedy granted must be one that is "appropriate" in light of the purpose of the Act, which is to provide disabled "children with a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." Sch. Comm. of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359, 369 (1985) (internal quotations omitted). The definition of related services "encompasses those supportive services that 'may be required to assist a child with a disability to benefit from special education.'" Cedar Rapids Cmty. Sch. Dist. v. Garret F., 526 U.S. 66, 73 (1999) (quoting 20 U.S.C. § 1401(a)(17) (1994), renumbered as 20 U.S.C. § 1401(22) (Supp. IV 1998)). This language indicates that compensatory educational services are an appropriate remedy. The statutory language also permits the district court to authorize reimbursement to parents who have actually incurred expenses in funding an appropriate special education where the court determines that the school district's IEP was inappropriate. Sch. Comm. of Burlington, 471 U.S. at 370. The Supreme Court rejected an attempt to characterize

this remedy as "damages," noting that reimbursement merely requires the belated payment of expenses that the school district should have paid in the first instance. Id. at 370-71. We have specifically noted that appropriate relief under the IDEA "includes compensatory education services but excludes general and punitive damages." Birmingham v. Omaha Sch. Dist., 220 F.3d 850, 856 (8th Cir. 2000) (internal citations omitted).

In my opinion, requiring the reimbursement of expenses already paid by the parents to ensure that a child's education is at no cost to the parents is to be distinguished from the granting of a windfall monetary award where the parents never paid for the child's education. Here, the District violated its obligation to provide a free appropriate education and must provide an appropriate remedy. In this case, however, the District's ability to provide compensatory education to fulfill its obligation to the child has been somewhat frustrated by the child's removal of herself from the school district. On the other hand, because the record does not show that her parent spent any money to enroll her in a residential treatment setting in order to obtain an appropriate education for her, any monetary award cannot now be characterized as reimbursement and would do nothing to fulfill the purpose of the Act. In my view, the student is entitled to receive from the District at its expense the residential setting educational opportunity she was entitled to but did not receive, but only for the length of time she actually resided within the school district. That opportunity may only exist in a setting outside of the district. Neither her incorrigibility nor her parent's inability to keep her in the school district or in the prior educational placements designed to meet her emotional and behavioral problems should be rewarded with money. Compensatory education is appropriate, but compensatory dollar damages that may or may not be used to fund the education necessary for her and that do not amount to reimbursement are not.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.