BYE, Circuit Judge,
dissenting.
The record in this case portrays a clear contrast. When the District adapted its approach to meet CJN’s unique needs, he made some progress on his behavioral disabilities. But when the District expected CJN’s behavior to conform to its structured and inflexible approach, he began to self-destruct. Because the IDEA requires the District to adapt to a child’s “unique needs,” 20 U.S.C. § 1400(d)(1), rather than the child to the District’s “normal” approach, I respectfully dissent.
I
I start with a more-detailed explanation of this case’s background, based upon the findings of the independent hearing officer (HO).
CJN was born on December 28, 1991. Between the ages of two and four, he suffered from chronic upper respiratory infections and consistent high fevers. During the 1994-95 winter season he experienced four seizures as a result of high fevers. In 1999 he began experiencing headaches. An MRI performed in February 2000 revealed lesions and atrophy in the right frontal lobe of his brain. CJN’s brain injury was most likely due to the previous infections, demyelination (nerve damage), or possibly a stroke. The frontal lobe of the brain is associated with self-regulation skills, such as the capacity to inhibit inappropriate behavior, and to control emotions.
CJN’s emotional problems began at an early age. When he started kindergarten in February 1998 at Parkview Elementary School, he already had a history of explosive outbursts at home, at pre-school, and at day care, where his behavior would escalate to the point of threats and violence. His mother requested the District to evaluate him for placement in special education, and he eventually was placed in special education.
CJN’s behavior problems continued while at Parkview. Gary Berg, a District employee identified as a “Behavior Person,” worked with CJN through kindergarten and first grade. In the beginning of his first grade year, CJN spent a great deal of time in time-outs, which were unsuccessful in regulating his behavior. He was transferred to another teacher and responded more favorably to a behavior program initiated by Berg that utilized replacement behaviors and role-play instead of time-outs. In part, Berg’s system allowed CJN to signal when he felt he needed to be out of the classroom. CJN would remove himself from the classroom, and sometimes go visit with Berg, until CJN felt he was ready to return to the classroom.
During the summer between first and second grade, CJN received an occupational therapy (OT) evaluation. The evaluation found CJN had excessive tactile sensitivities (e.g., irritated by labels on clothing), was averse to grooming activities, was overly active, had a moderate to high degree of sensory defensiveness in his reactions to touch, sound, smell, and visual stimuli, and sometimes engaged in self-injurious behavior. The evaluation recommended “calming activities” to minimize CJN’s chances of becoming overstimulated and leading to an outburst. These calming activities included heavy work to use the large muscles of his body, such as carrying objects, moving furniture, or doing push-ups. The evaluation also *644 recommended oral activities, such as sucking thick substances through a straw, or chewing gum.
At the start of second grade (the 1999-2000 school year) CJN’s condition deteriorated. In October 1999 he was removed from school in mid-November while his psychiatric medication was more aggressively introduced^ and eventually hospitalized for psychiatric care for nine days, followed by a three-week day-treatment program. When he returned to school in March 2000, Berg suggested that CJN attend a Special Elementary Needs (SPEN) classroom taught by Mary Thompson at Marcy School. CJN spent March, April and May 2000 in Thompson’s room, prior to being hospitalized again in May. Ms. Thompson had some success with CJN, describing him as “a beautiful child, very intelligent, very sensitive” but with “very severe needs with lots of sensory issues, and some neurological processing issues.” HO Findings of Fact #42, Add. 13. CJN’s placement with Thompson was followed by a successful summer program at Washburn Child Guidance Center, which his mother initiated. She privately hired Joseph Brown, a school district employee who worked with CJN in Ms. Thompson’s classroom, to be CJN’s one-on-one aide during the summer program.
In third grade (2000-2001 school year), the Marcy School programs taught by Ms. Thompson moved to Keewaydin School. CJN moved with Ms. Thompson to Kee-waydin, and started third grade in her classroom. But after a few weeks, CJN transferred to a special education classroom taught by Elana Schroeder. The District gave two reasons for the transfer. First, the students in Ms. Thompson’s classroom were at a lower academic level than CJN (whose academic abilities were average but impeded by his behavioral problems), and the students in Ms. Schroeder’s classroom were a closer fit academically for CJN. Second, after a successful spring and summer, CJN’s Individualized Education Plan (IEP) team believed he was ready for more responsibility and structure.
His condition quickly deteriorated in Ms. Schroeder’s classroom. Despite the prior failures of a time-out approach with CJN, Ms. Schroeder used only a time-out system to handle CJN’s behavioral problems. The District failed to implement the mother’s recommendations to use the calming techniques recommended in the OT evaluation. The District failed to implement a system with immediate rewards/consequences for appropriate/inappropriate behavior, or the successful approach used by Berg while CJN was in second grade. The District failed to implement the mother’s request for the one-on-one assistance that proved successful during the summer of 2000. Essentially, Ms. Schroeder expected CJN to adapt himself to her structured approach, rather than Schroeder adapting her approach to meet CJN’s special needs. The HO concluded “the Student was expected to fit into the program and the program was not adjusted to meet the needs of the Student.” HO Conclusions # 12, App. at 61.
Ms. Schroeder apparently did not believe CJN was disabled, but, instead, a manipulative and controlling child. In a phone call during the time CJN was in Ms. Schroeder’s classroom, Schroeder told CJN’s mother that her claim of frontal lobe brain injury was simply an excuse for allowing CJN to do what he wanted to do.
The results of this combination (an educator who discredited the child’s disability and expected the child to conform his behavior to the teacher’s “normal” approach rather than adjusting her approach to meet the child’s unique behavioral needs) were disastrous. CJN’s outbursts wors *645 ened as a result of the use of time-outs, and the seclusion he experienced. During a fourteen day period in September 2000, CJN spent a part of seven days in seclusion after having been restrained. From October 9 to November 13, CJN was restrained on more than half of all days, at a rate eleven times greater than other students in Ms. Schroeder’s class. CJN would verbally abuse, kick, and spit at District personnel who restrained him. He would threaten his teacher and other students by claiming he would bring a gun or knife to school the following day. The District reached the point where they advised CJN’s mother it would resort to police intervention to deal with CJN’s outbursts.
On November 16, 2000, that is exactly what happened. With as much time as CJN was spending at school in restraints or seclusion, he understandably would not get off the bus the morning of November 16. He pushed and kicked staff and threatened to kill them. He yelled and threatened peers, and wiped his mucus on them. He continued his outburst after he got to Ms. Schroeder’s classroom. Finally, the police were called and removed this third grader from school.
On December 6, 2000, CJN punched a District staff member in the lip. That same day, Ms. Schroeder told CJN’s mother that CJN was the problem, that Schroeder had not wanted him in her classroom, and that she would continue to initiate police intervention at every opportunity. The next day, CJN’s mother requested an independent evaluation of CJN, objected to police intervention to address his disability-related behaviors while in school, and asked for a transfer to another classroom. The district finally enrolled CJN in another SPEN classroom at Whittier Elementary on January 16, 2001.
CJN fared no better at Whittier. Whittier also utilized the ineffective time-out system to address CJN’s outbursts, with even more serious consequences. CJN attended just seven days at Whittier. On four of those days he was locked in seclusion for excessive periods of time without any criteria for his release, without his mother’s consent or authority, and in direct opposition to the opinion of his current mental health provider. Finally, on January 24, 2001, while in the locked seclusion room, CJN attempted suicide by wrapping his shirtsleeve around his neck. The police were summoned again, and removed this third grader from the school in handcuffs. Thus, in five months, while the school used a time-out approach already shown to be unsuccessful during CJN’s first and second grades, all the behavioral progress CJN made during the previous spring and summer had been replaced by suicidal ideations. Frustrated with the District’s failures, CJN’s mother found a private school that could, and did, meet her child’s unique behavioral needs. By the time the HO held its hearings in March and April of 2001, CJN had made significant progress at the Calvin Academy. The Calvin Academy educators had not resorted to locked seclusion or police intervention, the need for even short periods (less than five minutes) of any restraint had substantially subsided, and CJN had less behavioral outbursts at home and an increased interest in learning, friends, and school.
II
Three things concern me about the majority’s decision. First and foremost, notwithstanding its assertion to the contrary, I believe the majority decision essentially holds the District can satisfy its duty to provide a FAPE so long as a student with a behavioral disability makes academic progress. Such reflects a myopic view of *646 the purpose of the IDEA. The educational benefits of an IEP must be reasonably calculated to address more than academic ability or disability. As we stated in Indep. Sch. Dist. No. 284 v. A.C., 258 F.3d 769 (8th Cir.2001):
The IDEA clearly includes “emotional disturbance[s]” as disabilities. 20 U.S.C. § 1401(3)(A). According to the Department of Education, an emotional disturbance is
[A]condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child’s educational performance:
(A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.
(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.
(C) Inappropriate types of behavior or feelings under normal circumstances.
(D) A general pervasive mood of unhappiness or depression.
(E) A tendency to develop physical symptoms or fears associated with personal or school problems.
34 C.F.R. § 300.7(c)(4)(i).
Read naturally and as a whole, the law and the regulations identify a class of children who are disabled only in the sense that their abnormal emotional conditions prevent them from choosing normal responses to normal situations. See Honig, California Superintendent of Public Instruction v. Doe, 484 U.S. 305, 320, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (stating, of an emotionally disturbed student, that “[i]t is [the student’s] very inability to conform his conduct to socially acceptable norms that renders him ‘handicapped’ within the meaning of the EHA”).
258 F.3d at 775-76.
Even more to the point, we recently decided Neosho R-V Sch. Dist. v. Clark, 315 F.3d 1022 (8th Cir.2003), which addressed whether FAPE was provided to Robert Clark, a child with behavioral and learning disabilities. We concluded that “because the IEPs did not appropriately address his behavior problem, Robert was denied a free appropriate public education.” 315 F.3d at 1028 (emphasis added). We also addressed whether the administrative hearing panel erred in discounting the slight academic progress Robert had made. We concluded it had not:
Our review of the record convinces us that the panel did not err in discounting the evidence of de minimis academic and social progress where the panel pointed to specific evidence in the record contradicting such a benefit and noted that any slight benefit obtained was lost due to behavior problems that went unchecked and interfered with his ability to obtain a benefit from his education.
Id. at 1029 (emphasis added).
As the majority correctly notes, academic progress may be an “important factor” in ascertaining whether an IEP provides educational benefit, ante at 638 (citing Hendrick Hudson Dist. Bd. of Educ. v. Rowley, 458 U.S. 176, 203, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)), but it is clearly not the only factor. The Supreme Court noted the limited nature of its holding in Rowley, stating:
One child may have little difficulty competing successfully in an academic setting with nonhandicapped children while another child may encounter great difficulty in acquiring even the most basic of *647 self-maintenance skills. We do not attempt today to establish any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act.... We do not hold today that every handicapped child who is advancing from grade to grade in a regular public school is automatically receiving a “free appropriate public education.”
458 U.S. at 202, 203 n. 25, 102 S.Ct. 3034.
Rowley also explained that Congress passed the IDEA, in part, so that handicapped children could “achieve a reasonable degree of self-sufficiency” and “become a contributing part of our society.” Id. at 201 n. 23, 102 S.Ct. 3034. CJN has a behavioral disability that qualifies him for individualized education under the IDEA, not a learning disability. Thus, behavioral deficiencies, not learning deficiencies, are and will be his obstacle to achieving a reasonable degree of self-sufficiency and contributing to society as an adult. His current ability to read, write, or multiply simply is not the only issue. Therefore, the success of CJN’s IEP cannot be measured solely by the maintenance of his academic proficiency, but must include some reference to progress in teaching him to control his behavior.
If a child has a speech impediment that qualifies him for special education services, we do not measure the educational benefit he derives from attending speech therapy solely by his progress in math class. Or if a child qualifies for special education because of a reading impairment, we do not measure the educational benefit she derives from a remedial reading course by how well-behaved she is. And if the student was well-behaved prior to receiving special education services, but her IEP failed abysmally to address her reading impairment, we would not conclude the child received an educational benefit because she is still well-behaved.
Likewise, we cannot address the propriety of CJN’s IEP, or the District’s provision of a FAPE in this instance, solely by CJN’s performance in math or English or Geography. Rather, in determining whether the District provided a FAPE, we must also determine whether CJN received any benefit from the District in learning to control his behavior. Unlike Amy Rowley’s IEPs, which were not and could not be directed towards improving her hearing but merely ensuring that her deafness did not stand in the way of an “adequate” education, Rowley, 458 U.S. at 210, 102 S.Ct. 3034, the goals and directives of CJN’s IEPs were all directed towards teaching emotional, behavioral, and social skills,[2] not academics. The record is replete with evidence that the District’s use of a time-out system to restrain and control CJN’s behavior failed. The District’s approach to CJN’s unique disability was counter-productive and actually exacerbated his behavior problems. There is no evidence the time-out system and use of restraints taught CJN to control his behavior. Nor is there evidence the District’s ultimate resort to police intervention *648 would ever teach CJN how to become a productive member of society.[3]
Second, I am troubled by how easily the HO’s findings and conclusions were disregarded by the hearing review officer (HRO), the district court, and this court. We can engage in a semantical debate about which portions of the HO’s decision were “findings of fact” and which were “conclusions of law.” But the ultimate question whether FAPE has been provided is a mixed question of law and fact, as the majority recognizes. See ante at 637 (citing Strawn v. Missouri State Bd. of Educ., 210 F.3d 954, 958 (8th Cir.2000)). In cases where a state has a two-tier administrative system, and the courts are asked to review a conflict between the findings and conclusions of the two tiers, I believe we should defer to the administrative body that actually had an opportunity to observe the witnesses. See Fort Zumwalt Sch. Dist. v. Clynes, 119 F.3d 607, 610 (8th Cir.1997).
Our statement in Fort Zumwalt that a “court may choose to credit the hearing panel’s findings based on observations of the witnesses and reject the reviewing officer’s analysis if it does not appear to give sufficient weight to the views of the professional educators,” id., states only half the equation. In Fort Zumwalt we were faced with a conflict in which the first tier of the administrative process sided with the professional educators, and the second tier against them. See id. at 611. If the opposite had been true, as it is in this case, we might as easily have said a court may choose to credit the hearing panel’s dismissal of the views of the professional educators, and reject the reviewing officer’s analysis in their favor, based upon the hearing panel’s ability to observe the witnesses. In other words, our deference when reviewing a conflict between the first and second tiers of an administrative process should turn upon one tier’s ability to observe the demeanor of the witnesses, not upon whether the reviewing tier sides for or against the educators (i.e., does or does not give sufficient weight to the views of professional educators). In this case, the HO had the ability to observe the witnesses, not the HRO. The fact that the HO discredited the views of the school authorities, while the HRO gave them more weight (just the opposite of what occurred in Zumwalt) should not affect which administrative body we defer to when reviewing a conflict between the two.
Finally, I fear we allow Minnesota’s education system to take a step backward with our tacit approval of the District’s use of restraint to cope with CJN’s behavioral outbursts. The HO concluded the District failed to comply with certain state standards governing the use of punitive and aversive deprivation procedures. Specifically, the HO found the District failed to comply with Minn. R. 3525.0850, which requires that the “objective of any behavioral intervention must be that pupils acquire appropriate behavior and skills. It is critical that behavioral intervention programs focus on skills acquisition rather than merely behavior reduction or elimination.”
The HO also found the District failed to comply with Minn. R. 3525.1400, which requires that pupils receive education in “an atmosphere that is conducive to learning; and meet the child’s special physical, *649 sensory, and emotional needs.” These administrative rules were adopted pursuant to Minn.Stat. § 121A.67, which requires the rules to “promote the use of positive approaches and must not encourage or require the use of aversive or deprivation procedures.”
The District must meet the standards of the state’s educational agency as an integral part of providing FAPE. See Rowley, 458 U.S. at 208, 102 S.Ct. 3034 (holding that instruction and services “must be provided at public expense, must meet the State’s educational standards, must approximate the grade levels used in the State’s regular education, and must comport with the child’s IEP” in order to qualify as FAPE) (emphasis added); see also 20 U.S.C. § 1401(8)(B) (defining “free appropriate public education” as “special education and related services that ... meet the standards of the State educational agency”).
The HO concluded that CJN “was trapped in an increasingly punitive approach to disciplining, which resulted in increasing the levels of isolation, time-out and locked seclusion.” HO Conclusions # 12, App. at 61. Neither the district court or the HRO addressed the HO’s conclusion that the district violated Minn. R. 3525.0850 & 3525.1400 with its “increasingly punitive approach to disciplining.” Furthermore, I find most disconcerting this court’s attempt to explain away the District’s violations by suggesting that CJN’s mother was the obstacle to the adoption of an appropriate behavioral intervention program (BIP). My review of the record indicates that CJN’s mother opposed the BIPs suggested by the District precisely because they violated Minnesota law.
I am discouraged by this court’s tacit approval of the use of counter-productive and punitive disciplinary measures. We are essentially telling school districts that it’s copacetic to deal with students with behavioral disabilities by punishing them for their disability, rather than finding an approach that addresses the problem. We also tacitly approve the District’s resort to police intervention for the behavioral problems it helped create by failing to address CJN’s unique behavioral disorder. That is clearly not a message this court should dispatch.
I commend CJN’s mother for her wisdom in removing CJN from the destructive downward spiral created by the District’s inability to address her son’s unique educational, behavioral needs. She should now be reimbursed under the IDEA, pursuant to 20 U.S.C. § 1412(10)(C)(ii), for her decision to enroll her son in a private school capable of providing her son with an appropriate education.

. For example, CJN's IPE dated October 10, 2000, contains the four following goals:
Goal 1: [CJN] will continue to improve his ability to maintain self-control and act appropriately in the school setting.
Goal 2: [CJN] will improve his ability to complete work, comply with requests, follow directions and participate appropriately in class activities.
Goal 3: [CJN] will work toward independently solving problems in a positive manner by using common sense and anger management techniques.
Goal 4: [CJN] will develop skills to build and maintain friendships and to recognize his own self-worth.

. On this first point, I would add the following: the rapidity of CJN's decline maltes it abundantly clear that it was just a matter of time before CJN’s academic progress would have been affected by the District’s approach to his behavioral disability. At the end he was, after all, spending half his time outside the classroom locked up, and so despondent that he attempted suicide.