# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 02-1261

_____

| | | |
|---|---|---|
| CJN, by and through his Parent and Natural Guardian SKN, | * | |
| | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District |
| | * | of Minnesota. |
| Minneapolis Public Schools, Special | * | |
| School District No. 1; Minneapolis | * | |
| Board of Education; Catherine Shreves, | * | |
| Chair; Carol Johnson, Superintendent, | * | |
| in their representative capacities, | * | |
| | * | |
| Appellees. | * | |
| | * | |
| -------------------------- | * | |
| | * | |
| Children's Law Center of Minnesota; | * | |
| ARC Minnesota; ARC Hennepin- | * | |
| Carver, | * | |
| | * | |
| Amici on Behalf of | * | |
| Appellant. | * | |

_____

Submitted: October 11, 2002

Filed: March 21, 2003 (Corrected: 03/26/03)

_____

Before MORRIS SHEPPARD ARNOLD, MAGILL, and BYE, Circuit Judges.
_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

This case raises the question, among others, of whether a disabled student, whom we shall call CJN, received a free, appropriate public education (FAPE) in his third-grade year as required by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 – 1487.  The district court[1] held that he did, focusing on CJN's academic progress and the continuous efforts to tailor his individualized education plan (IEP) to his behavioral challenges.  Because we agree with the district court that CJN received a FAPE, and agree as well with its assessment of related issues, we affirm.

I.

As part of providing a FAPE under the IDEA, a school must formulate an IEP tailored to the disabled child's unique needs.  20 U.S.C. § 1412.  For an IEP to pass substantive muster, it must be "reasonably calculated to enable the child to receive educational benefits." *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982).

CJN is an eleven-year-old boy with lesions in his brain and a long history of psychiatric illness.  A special education student in the Minneapolis Public Schools, Special School District No. 1 (District) since kindergarten, CJN has consistently had behavioral difficulties while nonetheless progressing academically at an average rate.

At the beginning of his third-grade year in September, 2000, CJN was placed in a special program for elementary needs (SPEN) classroom at Keewaydin

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

Elementary School (moving with a teacher from his prior school) while he awaited the results of a functional behavior assessment and an occupational therapy evaluation. Within a few weeks, he had transferred to Elana Schroeder's SPEN classroom, because it provided more structure and because her students functioned at a higher academic level. In light of CJN's educational needs, Ms. Schroeder offered him reduced homework assignments, more time to complete assignments, positive reinforcement for meeting minimal requirements, and a so-called token economy system for reinforcing good behavior.

CJN nevertheless misbehaved in Ms. Schroeder's classroom many times, leading to him being given "time-outs" and even to being physically restrained. Most episodes of restraint were for less than a minute, but there were six days on which CJN was restrained for five or more minutes: Restraint was used after CJN began kicking others, hitting staff with pencils, or banging his head against the wall. On one occasion in December, a behavioral outburst led to police intervention and a period of hospitalization for CJN. This was his last day at Keeywaydin.

CJN's IEP team convened in October, 2000, to discuss his evaluation results and recent misbehavior and again in November to discuss his behavioral goals and the procedures to be followed if CJN required restraint. Immediately after the holiday break, CJN's IEP team decided that he would divide his time between Whittier Elementary School and a day treatment program. At Whittier, CJN was to receive the help of a one-to-one paraprofessional and was to participate in a point reward system to reinforce good behavior. CJN attended Whittier for only seven half-days, however, because an episode occurred that required him to be taken to a local crisis center. The District and his mother then agreed to instruction at home, but, a day after that instruction began, his mother unilaterally decided to enroll CJN in Calvin Academy, a private school that serves disabled and "at-risk" students.

CJN's mother then filed a complaint with the Minnesota Department of Children, Families and Learning, seeking, among other things, a declaration that the District had not provided CJN with a FAPE and asking for reimbursement for his private school tuition. As part of this proceeding, several independent evaluators analyzed CJN, the principal evaluation being provided by Dr. Richard Ziegler. In March, the IEP team reviewed Dr. Ziegler's summary and proposed that CJN be placed in a "Public Separate Day School setting" which could provide more mental health services than Whittier. CJN has continued to have significant behavioral difficulties at Calvin Academy.

Based on 290 "findings of fact," an independent hearing officer (HO) found that although CJN had received a FAPE through the second grade, he had not received one from September 2000 to February 2001, mainly because of the lack of sufficient positive behavioral interventions during the latter period and the amount of physical restraint that he was subjected to. In addition to granting other relief, the HO ordered the District to reimburse CJN's mother for his private school tuition and placed him at Calvin through the 2002-2003 academic school year. On appeal, a state hearing review officer (HRO) reversed the HO's decision that CJN did not receive a FAPE from September 2000 to February 2001, adopting 286 of the HO's "findings of fact" and making thirty-five more of his own. The district court affirmed the HRO's decision, giving due weight to the HRO's conclusions and focusing on CJN's academic progress and his IEP team's continuous efforts to refine his IEPs to account for his behavioral challenges in its eight IEP team meetings between August 29, 2000, and March 2, 2001.

II.

CJN first argues that the district court erred by not deferring to the HO's conclusions of law and credibility determinations. In particular, CJN contends that the HRO wrongly reversed the HO's credibility determinations when adopting the

-4-

thirty-five additional "findings of fact" and making its "conclusions of law," upon which the district court relied.

Under the IDEA, a district court must review the state administrative record, hear additional evidence if requested, and, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). Although a district court should independently determine whether the child has received a FAPE, it must give "due weight" to agency decision-making. *See Independent Sch. Dist. No. 283 v. S.D.*, 88 F.3d 556, 561 (8th Cir. 1996). "The district court must give 'due weight' because the administrative panel had an opportunity to observe the demeanor of the witnesses and because the court should not substitute its own educational policy for those of the school authorities that they review." *Strawn v. Missouri State Bd. of Educ.*, 210 F.3d 954, 958 (8th Cir. 2000). When, as here, the relevant state has a two-tier administrative review system, we have recognized that "[w]here there is a conflict between the findings and conclusions of the hearing panel and the final reviewing officer, a court may choose to credit the hearing panel's findings based on observation of the witnesses." *Fort Zumwalt Sch. Dist. v. Clynes*, 119 F.3d 607, 610 (8th Cir. 1997), *cert. denied*, 523 U.S. 1137 (1998).

CJN contends that the HO properly discredited the views of the school authorities and, thus, the HRO erred by believing them and adopting "unsupported credibility-based findings of fact and conclusions." We reject this characterization of what the HRO did, however, since neither his additional findings nor his conclusions were based on credibility determinations different from those of the HO, much less on a different view of the underlying facts.

We admit that some confusion arises because both the HO and the HRO use the terms "findings of fact" and "conclusions of law" in an unconventional fashion. For instance, the vast majority of both the HO's and HRO's "findings of fact" are not facts

-5-

that the HO or HRO actually found, but rather statements of what different witnesses testified to during the twelve days of hearings before the HO. We believe that what the HO and the HRO actually found as facts are located in their "conclusions of law," intermixed with their actual legal conclusions.

Perhaps, given the 3000-page HO hearing transcript, it would be reasonable to believe that both the HO and HRO were endorsing as findings the testimony that they recited. But even if we were to draw that inference, nothing in the record indicates that the HO and HRO believed different witnesses to be credible or believed that different events occurred. In most instances, the HRO's "findings of fact" simply rehearsed matters that were already acknowledged in the HO's "findings of fact."

The HRO's "conclusions of law" also do not indicate that the HRO had a view of any witness's credibility that differed from the HO's, as revealed by a close analysis of the "conclusions of law" on which the HRO and the HO differed. Although two of the HRO's conclusions speak of the "credible evidence," neither rested on the existence of any fact that the HO did not acknowledge as well. Indeed, in our best estimation, we interpret the phrase "credible evidence" in these two conclusions to mean "evidence that suffices under the law." Consequently, we interpret the HRO's statements such as "there is no credible evidence that these reviews ... failed to adequately assess the appropriateness of the IEP" to mean only that he differed from the HO with respect to the relevant legal conclusion, *i.e.*, as to what constitutes an adequate assessment of the appropriateness of the IEP, and not with respect to the underlying facts.

CJN has not challenged any specific legal conclusion of the HRO as erroneous other than the HRO's ultimate determination that CJN had received a FAPE. He argues generally that the HO's conclusions of law "are so imbued with credibility determinations and educational expertise that they are owed significant deference," but this argument fails to recognize that the issue of whether a FAPE has been

provided is a mixed question of law and fact, *Strawn*, 210 F.3d at 958, and misapprehends the role of reviewing officers in two-tier administrative review systems. With such mixed questions, the HRO is obligated to determine independently the legal significance of the facts. That the HRO ultimately sided with the District means neither that he necessarily believed the school authorities' testimony more than the HO did nor that his analysis was incorrect. It means only that the HRO reached a different conclusion based on his understanding of the law. The district court did not err in giving "due weight" to the HRO's conclusion.

## III.

CJN also challenges the district court's decision not to reimburse CJN for his private school tuition. The IDEA provides that "[i]f the parents of a child with a disability, who previously received special education ..., enroll the child in a private elementary or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a [FAPE] available to the child in a timely manner prior to that enrollment." 20 U.S.C. § 1412(10)(C)(ii). The district court denied reimbursement pursuant to its decision that CJN had received a FAPE prior to his enrollment. We review the district court's determination that CJN received a FAPE *de novo*. *Strawn*, 210 F.3d at 958. But in "the absence of a mistake of law, we review the district court's factual determinations for clear error." *Id.*

CJN maintains that the district court erred in holding that the District provided him with a FAPE in his third-grade year based on academic progress alone. CJN contends that evidence of academic progress is particularly irrelevant here "because his disability does not adversely affect his ability to learn" academically. CJN points to the amount of physical restraint to which he was subject and the high number of "time-outs" imposed on him, arguing that they are fundamentally inconsistent with the existence of a FAPE. CJN maintains that Minnesota law requires more positive

behavioral reinforcement and more analysis of CJN's behavioral problems than CJN received before he can be said to have received a FAPE.

The District responds by stating that CJN's IEPs need to be analyzed at the time of their adoption. It asserts that his IEP team consistently focused on CJN's behavioral problems using the information that they had available, including a functional behavior assessment and an occupational therapy evaluation. It contends that CJN received positive behavioral interventions in the form of the token economy system and point rewards system as well as sufficient personalized services, such as the attention of a one-to-one paraprofessional. And it points to the fact that CJN was progressing at an average rate academically.

At the outset, we reject CJN's characterization of the district court's holding as based on academic progress alone. Although the district court does state that "CJN was learning within the average range in his academic subjects, thus demonstrating educational progress," this statement came only after the court's observations that "[w]ith CJN's behavioral challenges in mind, the team tailored the IEP to his needs" and that "[a]t numerous meetings, CJN's IEP team was continually making efforts to refine his instruction programs." We view the district court's acknowledgment of CJN's academic progress to mean only that his IEP was managing CJN's behavioral problems in a way that allowed him to learn. *Cf. Indep. Sch. Dist. No. 284 v. A.C.*, 258 F.3d 769, 777 (8th Cir. 2001). Academic progress, the Supreme Court has stated, is an "important factor" in ascertaining whether a disabled student's IEP was reasonably calculated to provide educational benefit. *Rowley*, 458 U.S. at 202.

We also reject CJN's contention that because academic progress "has not been identified as among C.J.N.'s educational needs," evidence of academic progress is particularly irrelevant in CJN's case. As we recently noted in *A.C.*, 258 F.3d at 776-77, "at least in Congress's judgment, social and emotional problems are not *ipso facto* separable from the learning process." Behavioral difficulties might impede learning

ability even if the individual is not learning disabled. *Id.* The record squarely supports the conclusion that that is the situation here. For instance, Dr. Ziegler's report explains how frontal lobe activity is responsible for an individual's ability to plan and affects his or her "flexibility, generation of information, inhibition of impulses, and working memory." In relation to CJN, Dr. Ziegler states that "[w]hile some skills associated with frontal lobe functioning are intact, it is clear that his behavioral and emotional dysregulation and disinhibition associated with his frontal striatal lesion can overwhelm these adequately developed skills to [the] point where he is unable to utilize them in his school environment." Unlike the situation in *A.C.*, 258 F.3d at 777, where the student was falling behind despite the lack of a learning disability, CJN has always progressed academically at an average rate. That his behavioral difficulties are severe, as CJN contends, makes his academic progress even more relevant to the educational benefit inquiry, because it demonstrates that his IEPs were not only reasonably calculated to provide educational benefit, but, at least in part, did so as well.

When a disabled student has failed to achieve some major goals, it is difficult to look back at the many roads not taken and ascertain exactly how reasonable his IEPs were at the time of their adoption. *Cf. Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir. 1990), *cert. denied*, 499 U.S. 912 (1991). But this difficulty is precisely why we have recognized that "[a]s long as a student is benefiting from his education, it is up to the educators to determine the appropriate educational methodology." *Fort Zumwalt*, 119 F.3d at 614. Specific results are not required, 34 C.F.R. § 300.350 (b), and an IEP need not be designed to maximize a student's potential "commensurate with the opportunity provided to other children," *see Rowley*, 458 U.S. at 189-198. Thus, even assuming *arguendo* that more positive behavior interventions could have been employed, that fact is largely irrelevant. The record reveals that the District made a "good faith effort" to assist CJN in achieving his educational goals. *See* 34 C.F.R. § 300.350(a)(2). Although it is true, as CJN contends, that the District "offered only services available within its standardized

programs for students with emotional and behavioral disorders," one can reasonably conclude from this record that more did not appear necessary at the time to help him progress behaviorally. Indeed, at the January IEP meeting, undisputed testimony indicates that the District suggested a more structured setting as an alternative to Whittier, but CJN's mother chose Whittier instead.

We of course very much regret that CJN was subject to an increased amount of restraint in his third-grade year, but that fact alone does not make his education inappropriate within the meaning of the IDEA. In response to his difficulties, the District made its suspension policy more lenient, suspending him only in the case of physical aggression to adults, children, or property. We believe that this demonstrates a good faith effort and comports, moreover, with a previous observation of ours that schools' suspension policies toward disabled students must be "appropriate in the context of the IEP." *See A.C.*, 258 F.3d at 776. Because the appropriate use of restraint may help prevent bad behavior from escalating to a level where a suspension is required, we refuse to create a rule prohibiting its use, even if its frequency is increasing.

CJN contends that restraints and "time-outs" were used inappropriately here, pointing to four purported violations of Minnesota rules governing behavioral interventions. In analyzing these purported deficiencies, we note that minor "procedural and technical deficiencies in the IEPs" cannot support a claim that a FAPE has been denied. *See S.D.*, 88 F.3d at 562; *cf. Evans v. Dist. No. 17 of Douglas County, Nebraska*, 841 F.2d 824, 830-31 (8th Cir. 1988).

As CJN correctly notes, under the IDEA a disabled student's IEP must "meet the standards of the State educational agency." 20 U.S.C. § 1401(8)(B). Thus, "[w]hen a state provides for educational benefits exceeding the minimum federal standards set forth under *Rowley*, the state standards are ... enforceable through the

IDEA." *Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist.*, 198 F.3d 648, 658 (8th Cir. 1999).

First, CJN contends that his IEP was inappropriate because CJN was constantly being restrained in emergency situations and his team failed to develop a behavioral intervention program (BIP) that focused on skill acquisition. CJN argues that such a BIP was required because Minnesota has chosen to exceed the federal requirements.

Under the IDEA, IEP teams are required to consider positive behavioral interventions where appropriate. 20 U.S.C. § 1414(d)(3)(B)(i). Under Minnesota law, "[t]he objective of any behavioral intervention must be that pupils acquire appropriate behaviors and skills. It is critical that [BIPs] focus on skills acquisition rather than merely behavior reduction or elimination." Minn. R. 3525.0850. Neither the district court nor the HRO explicitly addressed this Minnesota requirement, although the HRO's decision arguably did so implicitly when it pointed to the existence of positive reinforcement mechanisms such as the token economy system in CJN's IEP.

At the October IEP meeting, Ms. Schroeder had proposed a BIP that included both positive reinforcement mechanisms as well as what is called conditional procedures (*e.g.*, time-outs and physical restraint). No BIP was adopted, however, because of CJN's mother's disagreement with the proposal. They discussed the matter again in November, at which time CJN's mother dismissed the team's suggestions as counterproductive. In January, CJN's teacher at Whittier was in the process of developing a plan, but CJN was withdrawn from her classroom before she finished it. Heeding *Rowley*'s warning that "courts must be careful to avoid imposing their view of preferable educational methods upon the States," 458 U.S. at 207, and giving "due weight" to the HRO's implicit decision of sufficiency, we do not believe that the failure to develop a BIP could fairly be said to constitute a denial of a FAPE in these circumstances.

-11-

CJN also contends that the number of IEP team meetings was insufficient in view of a Minnesota rule providing that when conditional procedures are used in an emergency situation "twice in a month or [when] a pupil's pattern of behavior is emerging ... a team meeting must be called to determine if the pupil's IEP is adequate ... no later than five school days after emergency procedures have commenced." Minn. R. 3525.2900, subp. 5C. The district court did not discuss this rule.

This rule was violated if one views the five-day requirement as restarting with every two emergency interventions. Conditional procedures were used on October 10, 11, and 12, but the only IEP meetings were on October 10 and November 14. We need not, however, resolve the nuances of the rule's interpretation, because the record reveals that any potential violation was immaterial. As we have already noted, CJN's IEP team consistently addressed the use of conditional procedures in their IEP meetings, but a BIP was not adopted because of his mother's disagreement. We believe that the purpose of the relevant rule is to guarantee that the IEP team is aware that conditional procedures have been employed and to allow the IEP team to develop a BIP, because under Minnesota law conditional procedures can be used either in an emergency situation *or* pursuant to a BIP (as part of an IEP), *see id.* subp. 5A(1). That requisite awareness and the attempt to develop a BIP already existed here. Failure to hold more meetings is immaterial.

CJN points, in addition, to a state requirement that IEP teams identify "the frequency and severity of target behaviors for which the conditional procedure is being considered" before using conditional procedures. *Id.* This provision, however, does not apply here, as it pertains only to conditional procedures resorted to as part of a BIP and not to emergency situations like the ones in the instant case.

CJN argues finally that "time-outs" of more than an hour violate state standards *per se*, citing a state administrative decision that holds that"[s]eclusion for brief periods may be defensible, but not confinement for one to six hours forcing a student

-12-

into discomfort, making [the action at issue] a punitive, negative intervention" under Minn. R. 3525.0850. *Complaint File # 1408*, p.16 (State Educ. Agency Minn. March 29, 2002). But close analysis of the Minnesota Department of Children, Families and Learning's statement in this file reveals that its conclusion was based both on the duration of the "time-out" and the fact that the "time-out" room had no place for the child to sit, which is not the situation here. Furthermore, the only time-outs of more than an hour occurred in the seven half-days at Whittier. Any violation of the State's rule would therefore be immaterial to a larger determination of whether reimbursement was required. *Cf. S.D.*, 88 F.3d at 562.

We believe, moreover, that all the other purported deficiencies to which CJN directs our attention, such as the absence of a specifically identified "Public Separate Day School" in the March IEP (the IEP listed only the relevant setting level and not a precise location) are equally immaterial to our discussion given the February decision to enroll CJN in private school. Accordingly, the district court did not err in determining that the District provided CJN with a FAPE in his third-grade year and in denying CJN's mother's request for tuition reimbursement.

IV.

CJN next maintains that the district court erred by not ordering his prospective placement at Calvin, since that school offers more interaction with children who are not disabled than Crawford Academy, the currently proposed "Public Separate Day School." We disagree.

While it is true that the IDEA expresses a strong preference in favor of disabled children attending regular classes with children who are not disabled, *see* 20 U.S.C. § 1412 (5) (1994), the Supreme Court has held that this creates a presumption in favor of public school placement, *see School Comm. of Burlington v. Department of Educ. of Mass.*, 471 U.S. 359, 373 (1985). We have stated that the IDEA's objective is satisfied when there are disabled students and students who are not disabled at the

same school. *Mark A. v. Grant Wood Area Educ. Agency*, 795 F.2d 52, 54 (8th Cir. 1986), *cert. denied*, 480 U.S. 936 (1987). Because there are students who are not disabled at Crawford, the district court did not err in failing to order Calvin as CJN's prospective placement.

V.

CJN argues finally that the district court erred in determining that CJN was not entitled to remain at Calvin pending a final determination on the merits of this appeal, given the HO's decision that Calvin was the appropriate prospective placement. Under the IDEA's so-called "stay-put" provision, "during the pendency of any proceedings [under § 1415], unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of such child ... until all such proceedings have been completed." 20 U.S.C. § 1415(j). CJN's mother and the District reached an interim agreement that the District would pay for CJN to attend Calvin until February 4, 2002, but they also agreed that this agreement would not affect CJN's "stay-put" placement. The district court held that CJN's mother was responsible for private school tuition after February 4.

CJN argues that the HO's decision in favor of CJN created an agreement to change his "stay-put" placement. We disagree. We recognize that federal regulations provide that "[i]f the decision of a hearing officer in a due process hearing conducted by the [state education agency] or a State review official in an administrative appeal agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State or local agency and the parents for purposes of [stay-put placement]." 34 C.F.R. § 300.514 (c). But neither of the alternative conditions for a stay-put agreement is met here. Under Minnesota law, the HO decision is conducted by the school district, Minn. Stat. § 125A.09, subd. 6, which is considered only a local education agency and not a state education agency, *see* Minn. Stat. § 125A.09, subd. 7; 20 U.S.C. §§ 1401(15)(A), 1401(28). In

-14-

the second tier of review, the state appoints an HRO, who conducts the review on behalf of the commissioner of the state education agency. *See* Minn. Stat. § 125A.09, subd. 9. Since the HRO denied private placement, there was no agreement to change the stay-put placement here. The district court thus did not err in holding that there was no agreement.

## VI.

Judge Bye contends that we are holding that any school district necessarily satisfies its duties to provide a student with a FAPE when a student with a behavioral disability makes academic progress. That is not the case. As we said, academic progress is an "important factor" among others in ascertaining whether the student's IEP was reasonably calculated to provide educational benefit. *Rowley*, 458 U.S. at 202. We believe, as the district court did, that the student's IEP must be responsive to the student's specific disabilities, whether academic or behavioral.

Academic and behavioral matters, however, are not always independent of each other. As we noted in *A.C.*, 258 F.3d at 776-77, "social and emotional problems are not *ipso facto* separable from the learning process." Where, as here, the record indicates that a student's behavioral problems, if unattended, might significantly curtail his ability to learn, the fact that he is learning is significant evidence that his behavioral problems have, at least in part, been attended to. Of course, we wish that CJN had made more behavioral progress, but the IDEA does not require that schools attempt to maximize a child's potential, or, as a matter of fact, guarantee that the student actually make any progress at all. It requires only that the student be provided with an IEP that is reasonably calculated to provide educational benefit and we conclude that that happened here.

*Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022 (8th Cir. 2003), does not cut against our conclusion. In fact, it supports it. In that case, both the state administrative panel and the district court held that the disabled student did not

-15-

receive a FAPE because his IEPs did not appropriately address his behavioral problems. *Id.* at 1026-28. On appeal, the school district argued that the panel and district court had improperly discounted evidence that some academic progress had been made. *See id.* at 1027-29. We noted that while there was "evidence of some slight academic progress," the evidence was "contradicted by other evidence in the record." *See id.* at 1029. For instance, we observed that every time the student's "special education teacher advanced his work to [his current grade level], the stress engendered resulted in behavioral problems that forced the teacher to readjust his work [downward] to afford [the student] a measure of success." *Id.* at 1029. We were therefore convinced that the administrative panel had not improperly discounted "the evidence of de minimis academic and social progress where the panel pointed to specific evidence in the record contradicting such a benefit and noted that any slight benefit obtained was lost due to behavior problems that went unchecked and interfered with his ability to obtain a benefit from his education." *Id.* This is in stark contrast to the circumstances in the instant case where there is undisputed evidence that CJN is progressing academically at an average rate, thus indicating, at the very least, that his behavioral problems are being sufficiently controlled for him to receive some educational benefit.

### VII.

Accordingly, we affirm the judgment of the district court.

BYE, Circuit Judge, dissenting.

The record in this case portrays a clear contrast. When the District adapted its approach to meet CJN's unique needs, he made some progress on his behavioral disabilities. But when the District expected CJN's behavior to conform to its structured and inflexible approach, he began to self-destruct. Because the IDEA requires the District to adapt to a child's "unique needs," 20 U.S.C. § 1400(d)(1), rather than the child to the District's "normal" approach, I respectfully dissent.

-16-

## I

I start with a more-detailed explanation of this case's background, based upon the findings of the independent hearing officer (HO).

CJN was born on December 28, 1991. Between the ages of two and four, he suffered from chronic upper respiratory infections and consistent high fevers. During the 1994-95 winter season he experienced four seizures as a result of high fevers. In 1999 he began experiencing headaches. An MRI performed in February 2000 revealed lesions and atrophy in the right frontal lobe of his brain. CJN's brain injury was most likely due to the previous infections, demyelination (nerve damage), or possibly a stroke. The frontal lobe of the brain is associated with self-regulation skills, such as the capacity to inhibit inappropriate behavior, and to control emotions.

CJN's emotional problems began at an early age. When he started kindergarten in February 1998 at Parkview Elementary School, he already had a history of explosive outbursts at home, at pre-school, and at day care, where his behavior would escalate to the point of threats and violence. His mother requested the District to evaluate him for placement in special education, and he eventually was placed in special education.

CJN's behavior problems continued while at Parkview. Gary Berg, a District employee identified as a "Behavior Person," worked with CJN through kindergarten and first grade. In the beginning of his first grade year, CJN spent a great deal of time in time-outs, which were unsuccessful in regulating his behavior. He was transferred to another teacher and responded more favorably to a behavior program initiated by Berg that utilized replacement behaviors and role-play instead of time-outs. In part, Berg's system allowed CJN to signal when he felt he needed to be out of the classroom. CJN would remove himself from the classroom, and sometimes go visit with Berg, until CJN felt he was ready to return to the classroom.

During the summer between first and second grade, CJN received an occupational therapy (OT) evaluation. The evaluation found CJN had excessive tactile sensitivities (e.g., irritated by labels on clothing), was averse to grooming activities, was overly active, had a moderate to high degree of sensory defensiveness in his reactions to touch, sound, smell, and visual stimuli, and sometimes engaged in self-injurious behavior. The evaluation recommended "calming activities" to minimize CJN's chances of becoming over-stimulated and leading to an outburst. These calming activities included heavy work to use the large muscles of his body, such as carrying objects, moving furniture, or doing push-ups. The evaluation also recommended oral activities, such as sucking thick substances through a straw, or chewing gum.

At the start of second grade (the 1999-2000 school year) CJN's condition deteriorated. In October 1999 he was removed from school in mid-November while his psychiatric medication was more aggressively introduced, and eventually hospitalized for psychiatric care for nine days, followed by a three-week day-treatment program. When he returned to school in March 2000, Berg suggested that CJN attend a Special Elementary Needs (SPEN) classroom taught by Mary Thompson at Marcy School. CJN spent March, April and May 2000 in Thompson's room, prior to being hospitalized again in May. Ms. Thompson had some success with CJN, describing him as "a beautiful child, very intelligent, very sensitive" but with "very severe needs with lots of sensory issues, and some neurological processing issues." HO Findings of Fact #42, Add. 13. CJN's placement with Thompson was followed by a successful summer program at Washburn Child Guidance Center, which his mother initiated. She privately hired Joseph Brown, a school district employee who worked with CJN in Ms. Thompson's classroom, to be CJN's one-on-one aide during the summer program.

In third grade (2000-2001 school year), the Marcy School programs taught by Ms. Thompson moved to Keewaydin School. CJN moved with Ms. Thompson to

Keewaydin, and started third grade in her classroom. But after a few weeks, CJN transferred to a special education classroom taught by Elana Schroeder. The District gave two reasons for the transfer. First, the students in Ms. Thompson's classroom were at a lower academic level than CJN (whose academic abilities were average but impeded by his behavioral problems), and the students in Ms. Schroeder's classroom were a closer fit academically for CJN. Second, after a successful spring and summer, CJN's Individualized Education Plan (IEP) team believed he was ready for more responsibility and structure.

His condition quickly deteriorated in Ms. Schroeder's classroom. Despite the prior failures of a time-out approach with CJN, Ms. Schroeder used only a time-out system to handle CJN's behavioral problems. The District failed to implement the mother's recommendations to use the calming techniques recommended in the OT evaluation. The District failed to implement a system with immediate rewards/consequences for appropriate/inappropriate behavior, or the successful approach used by Berg while CJN was in second grade. The District failed to implement the mother's request for the one-on-one assistance that proved successful during the summer of 2000. Essentially, Ms. Schroeder expected CJN to adapt himself to her structured approach, rather than Schroeder adapting her approach to meet CJN's special needs. The HO concluded "the Student was expected to fit into the program and the program was not adjusted to meet the needs of the Student." HO Conclusions #12, App. at 61.

Ms. Schroeder apparently did not believe CJN was disabled, but, instead, a manipulative and controlling child. In a phone call during the time CJN was in Ms. Schroeder's classroom, Schroeder told CJN's mother that her claim of frontal lobe brain injury was simply an excuse for allowing CJN to do what he wanted to do.

The results of this combination (an educator who discredited the child's disability *and* expected the child to conform his behavior to the teacher's "normal"

approach rather than adjusting her approach to meet the child's unique behavioral needs) were disastrous. CJN's outbursts worsened as a result of the use of time-outs, and the seclusion he experienced. During a fourteen day period in September 2000, CJN spent a part of seven days in seclusion after having been restrained. From October 9 to November 13, CJN was restrained on more than half of all days, at a rate eleven times greater than other students in Ms. Schroeder's class. CJN would verbally abuse, kick, and spit at District personnel who restrained him. He would threaten his teacher and other students by claiming he would bring a gun or knife to school the following day. The District reached the point where they advised CJN's mother it would resort to police intervention to deal with CJN's outbursts.

On November 16, 2000, that is exactly what happened. With as much time as CJN was spending at school in restraints or seclusion, he understandably would not get off the bus the morning of November 16. He pushed and kicked staff and threatened to kill them. He yelled and threatened peers, and wiped his mucus on them. He continued his outburst after he got to Ms. Schroeder's classroom. Finally, the police were called and removed this third grader from school.

On December 6, 2000, CJN punched a District staff member in the lip. That same day, Ms. Schroeder told CJN's mother that CJN was the problem, that Schroeder had not wanted him in her classroom, and that she would continue to initiate police intervention at every opportunity. The next day, CJN's mother requested an independent evaluation of CJN, objected to police intervention to address his disability-related behaviors while in school, and asked for a transfer to another classroom. The district finally enrolled CJN in another SPEN classroom at Whittier Elementary on January 16, 2001.

CJN fared no better at Whittier. Whittier also utilized the ineffective time-out system to address CJN's outbursts, with even more serious consequences. CJN attended just seven days at Whittier. On four of those days he was locked in

seclusion for excessive periods of time without any criteria for his release, without his mother's consent or authority, and in direct opposition to the opinion of his current mental health provider. Finally, on January 24, 2001, while in the locked seclusion room, CJN attempted suicide by wrapping his shirtsleeve around his neck. The police were summoned again, and removed this third grader from the school in handcuffs. Thus, in five months, while the school used a time-out approach already shown to be unsuccessful during CJN's first and second grades, all the behavioral progress CJN made during the previous spring and summer had been replaced by suicidal ideations. Frustrated with the District's failures, CJN's mother found a private school that could, and did, meet her child's unique behavioral needs. By the time the HO held its hearings in March and April of 2001, CJN had made significant progress at the Calvin Academy. The Calvin Academy educators had not resorted to locked seclusion or police intervention, the need for even short periods (less than five minutes) of any restraint had substantially subsided, and CJN had less behavioral outbursts at home and an increased interest in learning, friends, and school.

## II

Three things concern me about the majority's decision. First and foremost, notwithstanding its assertion to the contrary, I believe the majority decision essentially holds the District can satisfy its duty to provide a FAPE so long as a student with a *behavioral* disability makes *academic* progress. Such reflects a myopic view of the purpose of the IDEA. The educational benefits of an IEP must be reasonably calculated to address more than academic ability or disability. As we stated in Indep. Sch. Dist. No. 284 v. A.C., 258 F.3d 769 (8th Cir. 2001):

> The IDEA clearly includes "emotional disturbance[s]" as disabilities. 20 U.S.C. § 1401(3)(A). According to the Department of Education, an emotional disturbance is
>
>> [A] condition exhibiting one or more of the following characteristics over a long period of time and to a marked

degree that adversely affects a child's educational performance:

(A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.

(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

(C) Inappropriate types of behavior or feelings under normal circumstances.

(D) A general pervasive mood of unhappiness or depression.

(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

34 C.F.R. § 300.7(c)(4)(i).

Read naturally and as a whole, the law and the regulations identify a class of children who are disabled only in the sense that their abnormal emotional conditions prevent them from choosing normal responses to normal situations. See Honig, California Superintendent of Public Instruction v. Doe, 484 U.S. 305, 320, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (stating, of an emotionally disturbed student, that "[i]t is [the student's] very inability to conform his conduct to socially acceptable norms that renders him 'handicapped' within the meaning of the EHA").

258 F.3d at 775-76.

Even more to the point, we recently decided Neosho R-V Sch. Dist. v. Clark, 315 F.3d 1022 (8th Cir. 2003), which addressed whether FAPE was provided to Robert Clark, a child with behavioral *and* learning disabilities. We concluded that "because the IEPs did not appropriately address his *behavior problem*, Robert was denied a free appropriate public education." 315 F.3d at 1028 (emphasis added). We also addressed whether the administrative hearing panel erred in discounting the slight academic progress Robert had made. We concluded it had not:

-22-

Our review of the record convinces us that the panel did not err in discounting the evidence of de minimis academic and social progress where the panel pointed to specific evidence in the record contradicting such a benefit and noted that any slight benefit obtained was lost *due to behavior problems that went unchecked* and interfered with his ability to obtain a benefit from his education.

Id. at 1029 (emphasis added).

As the majority correctly notes, academic progress may be an "important factor" in ascertaining whether an IEP provides educational benefit, ante at 8 (citing Hendrick Hudson Dist. Bd. of Educ. v. Rowley, 458 U.S. 176, 203 (1982)), but it is clearly not the only factor. The Supreme Court noted the limited nature of its holding in Rowley, stating:

One child may have little difficulty competing successfully in an academic setting with nonhandicapped children while another child may encounter great difficulty in acquiring even the most basic of self-maintenance skills. We do not attempt today to establish any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act. . . . We do not hold today that every handicapped child who is advancing from grade to grade in a regular public school is automatically receiving a "free appropriate public education."

458 U.S. at 202, 203 n.25.

Rowley also explained that Congress passed the IDEA, in part, so that handicapped children could "achieve a reasonable degree of self-sufficiency" and "become a contributing part of our society." Id. at 201 n.23. CJN has a behavioral disability that qualifies him for individualized education under the IDEA, not a learning disability. Thus, behavioral deficiencies, not learning deficiencies, are and will be his obstacle to achieving a reasonable degree of self-sufficiency and

-23-

contributing to society as an adult. His current ability to read, write, or multiply simply is not the only issue. Therefore, the success of CJN's IEP cannot be measured solely by the maintenance of his academic proficiency, but must include some reference to progress in teaching him to control his behavior.

If a child has a speech impediment that qualifies him for special education services, we do not measure the educational benefit he derives from attending speech therapy solely by his progress in math class. Or if a child qualifies for special education because of a reading impairment, we do not measure the educational benefit she derives from a remedial reading course by how well-behaved she is. And if the student was well-behaved prior to receiving special education services, but her IEP failed absymally to address her reading impairment, we would not conclude the child received an educational benefit because she is still well-behaved.

Likewise, we cannot address the propriety of CJN's IEP, or the District's provision of a FAPE in this instance, solely by CJN's performance in math or English or Geography. Rather, in determining whether the District provided a FAPE, we must also determine whether CJN received any benefit from the District in learning to control his behavior. Unlike Amy Rowley's IEPs, which were not and could not be directed towards improving her hearing but merely ensuring that her deafness did not stand in the way of an "adequate" education, Rowley, 458 U.S. at 210, the goals and directives of CJN's IEPs were all directed towards teaching emotional, behavioral, and social skills,[2] not academics. The record is replete with evidence that the

_____

[2]For example, CJN's IPE dated October 10, 2000, contains the four following goals:

Goal 1: [CJN] will continue to improve his ability to maintain self-control and act appropriately in the school setting.

Goal 2: [CJN] will improve his ability to complete work, comply with

District's use of a time-out system to restrain and control CJN's behavior failed. The District's approach to CJN's unique disability was counter-productive and actually exacerbated his behavior problems. There is no evidence the time-out system and use of restraints taught CJN to control his behavior. Nor is there evidence the District's ultimate resort to police intervention would ever teach CJN how to become a productive member of society.[3]

Second, I am troubled by how easily the HO's findings and conclusions were disregarded by the hearing review officer (HRO), the district court, and this court. We can engage in a semantical debate about which portions of the HO's decision were "findings of fact" and which were "conclusions of law." But the ultimate question whether FAPE has been provided is a mixed question of law and fact, as the majority recognizes. See ante at 7 (citing Strawn v. Missouri State Bd. of Educ., 210 F.3d 954, 958 (8th Cir. 2000)). In cases where a state has a two-tier administrative system, and the courts are asked to review a conflict between the findings and conclusions of the two tiers, I believe we should defer to the administrative body that actually had an

requests, follow directions and participate appropriately in class activities.

Goal 3: [CJN] will work toward independently solving problems in a positive manner by using common sense and anger management techniques.

Goal 4: [CJN] will develop skills to build and maintain friendships and to recognize his own self-worth.

[3]On this first point, I would add the following: the rapidity of CJN's decline makes it abundantly clear that it was just a matter of time before CJN's academic progress would have been affected by the District's approach to his behavioral disability. At the end he was, after all, spending half his time outside the classroom locked up, and so despondent that he attempted suicide.

opportunity to observe the witnesses.  See Fort Zumwalt Sch. Dist. v. Clynes, 119 F.3d 607, 610 (8th Cir. 1997).

Our statement in Fort Zumwalt that a "court may choose to credit the hearing panel's findings based on observations of the witnesses and reject the reviewing officer's analysis if it does not appear to give sufficient weight to the views of the professional educators," id., states only half the equation.  In Fort Zumwalt we were faced with a conflict in which the first tier of the administrative process sided with the professional educators, and the second tier against them.  See id. at 611.  If the opposite had been true, as it is in this case, we might as easily have said a court may choose to credit the hearing panel's dismissal of the views of the professional educators, and reject the reviewing officer's analysis in their favor, based upon the hearing panel's ability to observe the witnesses.  In other words, our deference when reviewing a conflict between the first and second tiers of an administrative process should turn upon one tier's ability to observe the demeanor of the witnesses, not upon whether the reviewing tier sides for or against the educators (i.e., does or does not give sufficient weight to the views of professional educators).  In this case, the HO had the ability to observe the witnesses, not the HRO.  The fact that the HO discredited the views of the school authorities, while the HRO gave them more weight (just the opposite of what occurred in Zumwalt) should not affect which administrative body we defer to when reviewing a conflict between the two.

Finally, I fear we allow Minnesota's education system to take a step backward with our tacit approval of the District's use of restraint to cope with CJN's behavioral outbursts.  The HO concluded the District failed to comply with certain state standards governing the use of punitive and aversive deprivation procedures.  Specifically, the HO found the District failed to comply with Minn. R. 3525.0850, which requires that the "objective of any behavioral intervention must be that pupils acquire appropriate behavior and skills.  It is critical that behavioral intervention

programs focus on skills acquisition rather than merely behavior reduction or elimination."

The HO also found the District failed to comply with Minn. R. 3525.1400, which requires that pupils receive education in "an atmosphere that is conducive to learning; and meet the child's special physical, sensory, and emotional needs." These administrative rules were adopted pursuant to Minn. Stat. § 121A.67, which requires the rules to "promote the use of positive approaches and must not encourage or require the use of aversive or deprivation procedures."

The District must meet the standards of the state's educational agency as an integral part of providing FAPE. See Rowley, 458 U.S. at 203 (holding that instruction and services "must be provided at public expense, *must meet the State's educational standards*, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP" in order to qualify as FAPE) (emphasis added); see also 20 U.S.C. § 1401(8)(B) (defining "free appropriate public education" as "special education and related services that . . . meet the standards of the State educational agency").

The HO concluded that CJN "was trapped in an increasingly punitive approach to disciplining, which resulted in increasing the levels of isolation, time-out and locked seclusion." HO Conclusions #12, App. at 61. Neither the district court or the HRO addressed the HO's conclusion that the district violated Minn. R. 3525.0850 & 3525.1400 with its "increasingly punitive approach to disciplining." Furthermore, I find most disconcerting this court's attempt to explain away the District's violations by suggesting that CJN's mother was the obstacle to the adoption of an appropriate behavioral intervention program (BIP). My review of the record indicates that CJN's mother opposed the BIPs suggested by the District precisely because they violated Minnesota law.

I am discouraged by this court's tacit approval of the use of counter-productive and punitive disciplinary measures. We are essentially telling school districts that it's copacetic to deal with students with behavioral disabilities by punishing them for their disability, rather than finding an approach that addresses the problem. We also tacitly approve the District's resort to police intervention for the behavioral problems it helped create by failing to address CJN's unique behavioral disorder. That is clearly not a message this court should dispatch.

I commend CJN's mother for her wisdom in removing CJN from the destructive downward spiral created by the District's inability to address her son's unique educational, behavioral needs. She should now be reimbursed under the IDEA, pursuant to 20 U.S.C. § 1412(10)(C)(ii), for her decision to enroll her son in a private school capable of providing her son with an appropriate education.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.